Estate of Mark W. Munroe, Mary G. Munroe and George W. Munroe, Executors v. Commissioner.
Estate of Mark W. Munroe, Mary G. Munroe & George W. Munroe, Ex'rs v. Commissioner
Docket No. 5250.
United States Tax Court
1946 Tax Ct. Memo LEXIS 245; 5 T.C.M. (CCH) 122; T.C.M. (RIA) 46050; March 6, 1946
Frank J. Wideman, Esq., E. Barrett Prettyman, Esq., and John E. Shea, Esq., 822 Connecticut Ave., N.W., Washington 6, D.C., for the petitioners. Edward L. Potter, Esq., and Francis T. Donahoe, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in estate tax in the amount of $1,577,478.55. The questions presented for decision are: (1) Whether certain inter vivos gifts made by the decedent to his wife and children directly and through trusts were made in contemplation of death or were intended to take effect in possession or enjoyment at or after his death and should, therefore, be included in the decedent's gross estate under the provisions of section 811 (c) of the Internal Revenue Code *246 ; (2) What was the value on January 2, 1941, the optional valuation date, of certain securities held by the decedent at his death, and, if the Commissioner is sustained on question (1) above, what was the value of the securities thereby found to have been includible in the decedent's gross estate? Findings of Fact Mark W. Munroe died on January 2, 1940, at Quincy, Florida. He was almost 80. The immediate cause of death was hypostatic pneumonia which he contracted while confined to his bed with a fractured hip due to a fall seven days before his death. The executors, Mary G. and George W. Munroe, are the decedent's wife and a son. They selected the optional date of valuation, January 2, 1941, pursuant to section 811 (j), I.R.C. The return in question was filed with the collector of internal revenue for the district of Florida. The decedent was first married in 1883. His wife died in 1897. He remarried in 1912 at the age of 52. His wife, 11 children, 15 grandchildren, and 4 great-grandchildren survived him. The decedent executed three deeds of trust on November 24, 1934, for the benefit of his children. He named himself trustee in each and provided for *247 successor trustees. One of the trusts was principally for the benefit of his daughter, Edith. 75 shares of the common stock of Coca-Cola International Corporation (hereinafter referred to as International) were transferred to this trust at its creation. The trustee was required: To pay the net income from the trust estate to my daughter, Edith A. Askew, for and during her lifetime for the support and maintenance of herself and her family and upon her death to deliver over, transfer and assign all the securities held in trust by me as said Trustee in equal shares and portions unto her two children, Edith Askew and William Askew and any other children that she may bear; provided, however, only the income from the said trust estate shall be paid over to her respective children for their support and maintenance during their minority. When each shall have attained the age of twenty-one years, such portions of the principal as shall be allotted to them individually as above stated shall be assigned, transferred and delivered as each may reach the age of twenty-one. Should any of her said children predecease her the portion that would be coming to said child shall be divided in equal portions *248 amongst those surviving, provided said child or children should leave no descendants. Should any of them predecease the said Edith A. Askew, leaving descendants, their portions shall descend to their descendant per sterpe. The trust instrument made no provision for the further disposition of trust income or corpus in case of the failure of beneficiaries. Edith was 37 years old and had two minor children and a husband living on November 24, 1934. They all survived the decedent. The following additions were made to the trust: Feb. 29, 1935
60 shares International, Common
Aug. 3, 1935
150 shares International, Class
"A"
Nov. 12, 1936
100 shares International, Class
"A"
Oct. 8, 1937
50 shares International, Class
"A"
Dec. 23, 1937
75 shares Eagle and Phenix
Mills, Common
Dec. 23, 1937
20 shares Eagle and Phenix
Mills, Preferred
Another of the trusts was principally for the benefit of the decedent's son, Lee, and Lee's family. The trustee was required: To pay the net income from the trust estate to my son, Lee R. Munroe, for and during his lifetime for the support and maintenance of himself and his family and upon his death to deliver over, *249 transfer and assign all the securities held in trust by me as said Trustee in equal shares and portions unto his wife, Nonnie R. Munroe, his sons, Mark W. Munroe, Jr., Lee R. Munroe, Jr., and William D. Munroe. Should Nonnie R. Munroe predecease Lee R. Munroe her interest shall lapse. Should Mark W. Munroe, Jr., Lee R. Munroe, Jr., or William D. Munroe predecease Lee R. Munroe, leaving no descendants, their portions shall go to the survivor or survivors. Should any of them predecease Lee R. Munroe, leaving descendants, their portions shall descend to their descendants per sterpe. The decedent also transferred 75 shares of International common stock to Lee's trust at its creation and made subsequent additions as follows: Feb. 28, 1935 - 60
shares International, Common
Aug. 3, 1935 - 50
shares International, Class
"A"
Lee died on October 26, 1936. His wife and three children were living on November 24, 1934, and also on January 2, 1940. The trust terminated at Lee's death and the trust estate was distributed in accordance with the provisions of the instrument. No provision was made for disposition of the corpus and income in the event of a failure of beneficiaries. *250 The third trust was created for the benefit of the decedent's children, Mary, Julia, Margaret, Pat, William, Richard, Robert and Charles. He concurrently transferred to himself, as trustee, 600 shares of the common stock of International, 75 shares of which were to be held for the benefit of each child named. The trustee was instructed: To pay or not pay according to the option and judgment of the said Trustee all or any part or no part whatsoever of the net income from the trust estate created for the abovenamed beneficiaries upon their respective shares of seventy-five shares of the capital stock of the Coca-Cola International Corporation until each has reached the age of twenty-five years. As each beneficiary shall have attained the age of twenty-five years the shares of stock standing in my name as Trustee for them shall be assigned, transferred and delivered over to them. Should any of my above-mentioned children die before reaching the age of twenty-five years, leaving no descendants, their portion of the stock and securities held by me as Trustee for those so dying shall be divided in equal portions, share and share alike, amongst all of my children surviving at that time *251 - those of the half-blood and those of the whole-blood sharing equally. The following additions to the trust were made by the decedent: Feb. 28, 1935
480 shares International, Com-
mon
Aug. 3, 1935
1200 shares International, Class
"A"
Nov. 12, 1936
800 shares International, Class
"A"
Oct. 8, 1937
300 shares International, Class
"A"
Oct. 8, 1937
360 shares Coca-Cola Co., Class
"A"
All of the children named in the latter trust survived the decedent. Three were married, and there were four grandchildren living on January 2, 1940, resulting from these marriages. The trusts for Mary and Julia terminated before the decedent's death when each became 25 years of age, and their respective shares were distributed to them. The trusts for Margaret, Pat and William have terminated since the decedent's death. The decedent received none of the income from any of the trust property and had no right to receive any. George W. Munroe succeeded as trustee upon the death of the decedent, and has managed the trusts in strict accordance with their terms. The decedent made gifts to his son, George, as follows: Prior to 1934
Cash… $59,871.50
Nov. 24, 1934
75 shares International, Common
Feb. 8, 1934
60 shares International, Common
Aug. 3, 1935
150 shares International, Class
"A"
Nov. 12, 1936
100 shares International, Class
"A"
Oct. 8, 1937
50 shares International, Class
"A"
Dec. 23, 1937
75 shares Eagle and Phenix
Mills, Common
Dec. 23, 1937
20 shares Eagle and Phenix
Mills, Preferred
*252 He made the following gifts to his wife, Mary G. Munroe: Nov. 24, 1934
180 shares International, Common
Feb. 28, 1935
180 shares International, Common
Oct. 3, 1935
300 shares International, Class
"A"
Nov. 12, 1936
100 shares International, Class
"A"
Oct. 8, 1937
50 shares International, Class
"A"
Dec. 23, 1937
75 shares Eagle and Phenix
Mills, Common
Dec. 23, 1937
20 shares Eagle and Phenix
Mills, Preferred
The decedent also made numerous cash gifts to his wife and various children and grandchildren during the two-year period immediately preceding his death. These gifts totaled $117,000. The various gifts were made pursuant to a general plan of the donor to provide for the needs and establish the financial independence of his children during his lifetime while he was certain of the funds to do it. The gifts to the various children were substantially equal in value. The decedent's annual income after the transfer in trust was in excess of $100,000, with the exception of the year 1936 when it was somewhat less. All of the transfers in question were completed gifts. None of them was made in contemplation of death. The decedent at his *253 death owned, inter alia, 5,004 shares of the common stock of Coca-Cola Company (hereinafter referred to as Coca-Cola) and 2,026 shares of the common stock of International. Both of these stocks were listed on the New York Stock Exchange. Coca-Cola, a Delaware corporation, manufactured a well-known beverage syrup used in the preparation of a soft drink known as Coca-Cola. Coca-Cola had 4,000,000 common shares outstanding on December 31, 1940. Of these shares, 1,499,328 were held by International. International had no substantial income apart from dividends on Coca-Cola stock. It had no substantial assets other than the Coca-Cola stock and cash to cover a reserve for taxes. International, by appropriate action in 1935, provided for the exchange, at a stockholder's option, of International common stock for Coca-Cola common at the rate of eight Coca-Cola shares for one International. International stock thus acquired was to be retired. This ratio of exchange continued and was in effect on January 2, 1941. The executors of the decedent's estate did not sell or offer for sale during the period of a year after the death of the decedent any of the Coca-Cola or International common shares *254 owned by the decedent on January 2, 1940. The value of the 5,004 shares of Coca-Cola common stock on January 2, 1941 was $530,424. The value of the 2,026 shares of International common stock on January 2, 1941 was $1,718,048. The decedent, at the time of his death, owned 145 shares, or 14 1/2 per cent of the common stock of the Quincy State Bank. He had been president of that bank for 47 years and had personally directed and managed its affairs up to the time of his death. The shares were still owned by the estate on January 2, 1941. The 145 shares of stock of Quincy State Bank had a value on January 2, 1941 of $50,750. The values of Coca-Cola, International, and Quincy State Bank stock, as reported, and the values determined by the Commissioner, were as follows: No. Shares
Stock
Reported
Determined
5,004
Coca-Coca Common
$274,219.20
$ 530,424.00
2,026
International Common
900,962.20
1,718,048.00
145
Quincy State Bank
43,500.00
87,000.00
Opinion MURDOCK, Judge: The first question is whether certain transfers were made by the decedent in contemplation of death. Section 811 (c), I.R.C. There is a presumption that *255 they were made in contemplation of death because some of them were made within two years of the date of the death of the decedent and because the Commissioner has determined that all of them were made in contemplation of death. The respondent did not introduce any evidence upon this issue. There is no direct evidence that any of the transfers was made in contemplation of death. The respondent relies upon the presumptions and upon inferences which he would draw from evidence showing the state of the decedent's health at various times. He argues that the decedent was in miserable health, was racked with pain which he tried to conceal, and was endeavoring to divide his estate equally among his children before impending death could overtake him. The record does not support the inferences which the respondent would draw. The petitioners have recognized that they must overcome the unfavorable presumptions with evidence, and they have introduced a great deal of evidence for this purpose. It shows that the decedent had had no serious illness for many years preceding his death but, on the contrary had enjoyed remarkably good health. He was jovial and optimistic. He died as a result of a fall *256 in which he broke his hip. His inactivity after the fall brought on pneumonia from which he died seven days after the accident. Prior to that time he had had no physical infirmity of any kind which might reasonably have caused him to believe that his death was imminent. His principal occupation was banking and he devoted all of his working time to that business. He had not retired or withdrawn from business in any way. He was active in all of his business affairs right up to the time of the fatal accident. There is direct evidence also that the transfers which he made were for reasons connected with life rather than in contemplation of death. They were made to help members of his family so that he could see them successful in business and living happily, or at least properly cared for, during his lifetime. The great preponderance of the evidence supports the finding which has been made that none of the transfers was made in contemplation of death. The respondent also contends that the transfers to two of the trusts were intended to take effect in possession or enjoyment at or after death within the meaning of section 811 (c). The respondent's argument is that these trusts were intended *257 to take effect in possession or enjoyment at or after death because the property would revert to the decedent in case all named beneficiaries died. The decedent provided in each trust for the complete disposition of the trust property. The trust deeds did not contain any provision creating an estate in the decedent. They did not contain any reference whatsoever to a reversionary interest in him. It was, of course, theoretically possible that all of the beneficiaries named in the trust instrument might die before the decedent died or under circumstances which would cause a failure of the trust, so that the trust property would be returned by operation of law to the estate of the decedent and would pass as a part thereof. But no estate was created by the trust deeds which was in any way dependent upon the death of the decedent. The estates therein created were conditioned upon events which had no relation whatsoever to the death of the decedent. The cases of Helvering v. Hallock, 309 U.S. 106, and Goldstone, et al. v. United States, 325 U.S. 687, and similar cases upon which the respondent relies, are not in point. This case is ruled by Est. of Harold I. Pratt, 5 T.C. 881; *258 Est. of Harris Fahnestock, 4 T.C. 1096; Est. of Mary B. Hunnewell, 4 T.C. 1128; and Frances Biddle Trust, 3 T.C. 832, in which the Hallock and Goldstone case have been distinguished. The transfers to the three trusts were not made in contemplation of death and were not intended to take effect in possession or enjoyment at or after death within the meaning of section 811 (c). The above holding eliminates all question of the values of the securities which were the subject of the transfers. The only remaining questions are the values on January 2, 1941 of 5,004 shares of Coca-Cola common, 2,026 shares of International common and 145 shares of the stock of Quincy State Bank, Quincy, Florida. There is a great deal of evidence in the record relative to the values of these shares. It has been carefully analyzed in the opposing briefs. No attempt has been made to refer to all of it in this report. Suffice it to say that all of the evidence in the record has been carefully considered and analyzed in the light of the arguments and contentions of the parties in reaching the conclusions of the values set forth in the findings of fact which are determinative *259 of these issues. Each share of International common could be converted into 8 shares of Coca-Cola common. Both parties recognize that there is a close relation between these two stocks and a great deal of the evidence is upon the value of the Coca-Cola common on January 2, 1941. The Commissioner argues that the value of a share of International is exactly eight times the value of a Coca-Cola share while the petitioners contend that this amount must be discounted 5 per cent to allow for various things, including the expense, tax and inconvenience incident to a conversion. The expense, tax, and gain (or loss) upon a possible exchange or sale of stock have never been regarded as proper reductions in valuing the shares. There is evidence relating directly to the value of the International shares in addition to that relating to the value of the Coca-Cola stock. An argument is sometimes made in cases like this one that, in valuing a large block of stock, allowance must be made for the amount which secondary distributors would receive to cover their expenses and as their profit in the only practical method of selling a large block. The petitioners make no such argument here. They are *260 not seeking to knock a few points off the current market figures but contend, instead, for a value at least 21 points below the current market figure. They do not seek to justify this large difference by reference to a possible secondary distribution. Instead, they attempt to minimize the importance of evidence in the record pertaining to the possibility of a sale of this stock through secondary distribution methods. The value determined by the Commissioner for the Coca-Cola stock is the equivalent of the number of shares multiplied by 106. One hundred shares of Coca-Cola stock sold on the New York Stock Exchange on January 2, 1941 at $106 per share. The value found herein is not based solely upon that fact. There is a great deal of other evidence in this case and we have endeavored to give due consideration to all of it. There is evidence of the sales of the stock on the exchange for various periods up to and including January 2, 1941. There is evidence of other actual sales at current market figures shortly before January 2, 1941 and of the circumstances under which they were made. Evidence of some sales subsequent to January 2, 1941 has been considered in so far as it is relevant. *261 Earnings records, balance sheets, and evidence of business conditions and other conditions which might affect value have been considered. Opinion evidence, and evidence of the qualifications of the persons who expressed the opinion, has not been overlooked. One witness for the petitioners expressed the opinion that the value of the stock was from $70 to $75 per share, and another stated that it was $85 per share. A witness for the respondent stated that in his opinion the stock was worth $106 per share. These witnesses, and two others who testified in regard to securities and marketing of securities, were examined and cross-examined. No part of their testimony has been disregarded. The difference between the parties is even more marked on the question of the value of the bank stock. The petitioners contend that its value is not more than $325 a share, whereas the Commissioner contends that it is at least $600 a share. The evidence of actual sales tends to support the lower figure. Some support for the lower value is found in other evidence, including the opinions of residents of Quincy who were familiar with the whole situation. A witness who had never been in Quincy and who doesn't *262 know anything about the matter first hand, studied the balance sheet, the earning record, and perhaps other evidence relating to the operation of the Quincy Bank, compared it with other banks, and expressed the opinion that the stock was worth book value. The book value of the bank stock at the close of 1940 was about $754. The bank earned at least $61 per share during that year. Its earnings for prior years had not been quite so high and only something more than half of its earnings had been paid out in dividends. Three hundred dollars is less than 5 times current earnings and is less than one-half book value. These circumstances are not to be ignored or regarded lightly. One hundred shares of Coca-Cola common stock on January 2d sold at almost 16 times earnings, and prior sales were likewise relatively high in proportion to earnings, whereas the sales of the bank stock were amazingly low in proportion to earnings. None of this evidence has been overlooked. The petitioners argue that the death of the decedent, who practically ran the bank single handed, was an unfavorable factor to be considered in valuing the stock, whereas the respondent argues that the bank did better in the year *263 following the decedent's death than it had before. It is obvious, from what has been said, and it is even more obvious from a study of the record, that not all of the evidence can be reconciled with any figure of value, and that whatever figure might be selected would have some evidence opposed to it. There is room for difference of opinion about the values of the three stocks. The evidence is not overwhelming one way or the other. Values must be determined despite conflicting evidence and theories. The findings have been made after considering the entire record. Decision will be entered under Rule 50.